UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-419 (DSD/JMM)

Allen Glenn and Walter Linwood Anderson III, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**ORDER**

Daddy Rocks, Inc.,

Defendant.

Douglas A. Hedin, Esq., Daniel S. Goldberg, Esq., Elizabeth Glidden, Esq. and Hedin & Goldberg, 2100 Stevens Avenue South, Minneapolis, MN 55404, counsel for plaintiffs.

Marshall H. Tanick, Esq., Vincent J. Ella, Esq. and Mansfield, Tanick & Cohen, 1560 International Center, 900 Second Avenue South, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court on plaintiffs' motion for summary judgment on defendant's counterclaim and plaintiffs' request for sanctions under Fed. R. Civ. P. 11. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court grants plaintiffs' summary judgment motion and denies plaintiffs' request for sanctions.

62

FILED 6-18-01
FRANCIS E. DOSAL, CLERK
Judgment Ent'd. ______
Deputy Clerk's Initials

## BACKGROUND

Plaintiffs Allen Glenn ("Glenn") and Walter Linwood Anderson ("Anderson") (collectively "plaintiffs") filed this lawsuit under 42 U.S.C. § 1981 and the Minnesota Human Rights Act alleging that defendant Daddy Rocks, a nightclub in downtown Minneapolis, applied its dress code policy in a discriminatory manner and denied them entrance to the club because they are African American.

In 1999, Glenn made two attempts to enter the club but was denied entrance on both occasions. In July 1999, Glenn attempted to enter the club with his wife and another couple but was denied entrance allegedly because he wore open-toed shoes. In August or September of 1999, Glenn attempted to enter the club with another African American male but both men were denied entrance allegedly because they wore baseball caps.

Anderson also reported two attempts to enter the bar. First, in August or September of 1999, Anderson tried to enter Daddy Rocks with a group of several men and women. The bouncer told him he could not enter because he wore a sleeveless vest. Anderson walked across the street and purchased and put on a t-shirt under his vest and was permitted to enter upon his return. Then on November 12, 1999, Anderson again attempted to enter Daddy Rocks, this time as the only African American male in a small group of people. When he approached the door, the bouncer told him he could not enter because he wore a necklace. When a white female friend of Anderson

who was a "regular" at Daddy Rocks asked why he could not enter, a second bouncer told Anderson he could enter if he tucked his necklace inside his shirt. He did so and was permitted to enter. Also during this time frame, a local African-American talk show host named Fancy Rae McCloney was denied entrance to the bar and on November 11, 1999, City Pages, a Minneapolis newspaper ran an article regarding McCloney's experiences.

Anderson's own experiences prompted him to send an e-mail several weeks later to KSTP-TV which stated "I have information about a bar down town (sic) that is doing everything they can to keep blacks out of their bar." (Tanick Aff. Exh. 7.) He also sent a similar e-mail to WCCO-TV stating, "I have information about a bar down town (sic) that is heavily discriminating against blacks." (Tanick Aff. Exh. 6.) A WCCO producer responded to Anderson and the two later met, at which time Anderson identified the club and described his experiences. WCCO asked Anderson and Glenn to participate as "testers," pairing them with similarly dressed white counterparts and videotaping their attempts to enter the club. Based on the results of this test, the station decided to prepare and air an investigative report on the club.

Plaintiffs filed their lawsuit on February 25, 2000. On Sunday, February 27, 2000, WCCO aired its report on Daddy Rocks on the 10:00 p.m. news. The footage included an interview with one of the bouncers at Daddy Rocks, who described his views on the

differences between "blacks" and "niggers," the latter of which he attempted to keep out of the bar. After the broadcast, the Minneapolis Star-Tribune ran an article with the headline "Nightclub facing civil-rights probe after TV news report." (Glidden Aff. Exh. 4). The article detailed a race discrimination charged filed by the Executive Director of the Minneapolis Department of Civil Rights against Daddy Rocks. One day later, on March 2, 2000, the Star Tribune mentioned McCloney's claim of racism in its "CJ's Faces & Places" gossip column. (Id. Exh. 6.)

On June 30, 2000, plaintiffs moved to amend their complaint to add a public accommodations claim under Title II, 42 U.S.C. § 2000a. Daddy Rocks later stipulated to the amendment and the amended complaint was filed on July 24, 2000.

On July 10, 2000, a rap music concert was performed at the Target Center in downtown Minneapolis. That evening, a flyer was distributed which read

**Boycott "Daddy Rock's"**

> Daddy Rock's is headed by a Racist General Manager who has been quoted "Keep all niggers, chinks, and fags out of my club", while he was addressing his security staff. Please show your objection to such attitudes and boycotts.

(Glidden Aff. Exh. 7.) Bar patrons brought the flyer to the attention of management at Daddy Rocks, but little information was obtained about who may have distributed the flyer.

A second flyer was posted in the vicinity of the bar approximately one week later. According to Adam Verzalik, the head bartender at Daddy Rocks, he saw two African American men pasting flyers on telephone poles, street lights and other structures near Daddy Rocks between noon and 2:00 p.m. on Tuesday, July 18, 2000. (Verzalik Aff. ¶ 2; Glidden Aff. Exh. 14 at 12.)[1] The flyer read:

**Don't be made to look like a fool!!**

> "Daddy Rock's" Has no respect for you. They are trying to trick the public into thinking that it took less than six months for them to go from "We hate Niggers" to we Love all people no matter what color. What they are really saying is that we want all the good white people to come back to our place and spend their hard-earned money. Ignore the fact that we are a racist establishment.

(Glidden Aff. Exh. 8.)

On August 1, 2000, Verzalik viewed a videotape of the WCCO broadcast and identified plaintiffs Anderson and Glenn as the two men who he saw posting flyers. (Verzalik Aff. ¶ 5.) However, evidence submitted by plaintiffs confirms that both men were working at the time they were allegedly posting flyers in downtown Minneapolis. (Glenn Aff. ¶ 4; Chelberg Aff. ¶¶ 3-4; Anderson Aff. ¶¶ 4-5; Metz Aff. ¶¶ 2-3.)

On August 6, 2000, Daddy Rocks filed its answer to plaintiffs' amended complaint and added a counterclaim for defamation and

---

[1] Although Verzalik's affidavit refers to "Tuesday, July <u>17</u>", Verzalik clarified at his deposition that Tuesday, July <u>18</u> is the correct date. (Glidden Aff. Exh. 14 at 27.)

wrongful interference with economic expectancy. The counterclaim refers to Anderson's December 2000 e-mails to local television stations and the July 10th flyer. Plaintiffs now move to dismiss the two-part counterclaim on summary judgment.

**DISCUSSION**

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating to the court that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material only when its resolution affects the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 250.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential

element necessarily renders all other facts immaterial. See id. at 322-23. With this standard at hand, the court considers plaintiffs' motion for summary judgment.

**I. Evidentiary Basis for Counterclaim**

As a preliminary matter, the court must determine which statements may serve as the basis for defendant's counterclaim. In its answer and counterclaim, Daddy Rocks claims that the following statements were defamatory and unjustifiably interfered with its business prospects:

> a. Plaintiff Anderson wrote to various television stations, including WCCO-TV, on or about December 7, 1999, that Defendant was "heavily discriminating against blacks" and "doing everything they can to keep blacks out of their bar."
>
> b. Plaintiffs Anderson and Glenn, or persons acting on their behalf, wrote and distributed flyers on or about July 10, 2000, and at various times thereafter, stating that Defendant is headed by a "Racist General Manager, who has been quoted 'Keep all niggers, chinks, and fags out of my club' while he was addressing his security staff" and calling the bar a racist establishment.

(Doc. No. 20, p. 5.)

Federal courts favor specific pleading of defamation claims because "knowledge of the exact language used is necessary to form responsive pleadings." Asay v. Hallmark Cards, Inc., 594 F.2d 692, 699 (8th Cir. 1979). Similarly, Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim. Moreno v. Crookston Times Printing Co., 610 N.W.2d 321,

326 (Minn. 2000) (citing American Book Co. v. Kingdom Publ'g Co., 73 N.W. 1089, 1090 (Minn. 1898)). Based on this well-established precedent, defendant's ambiguous reference to the language of the July 18th flyer is not a sufficient basis for a defamation claim. Even if it were, there is no evidence linking either that flyer or the July 10th flyer to plaintiffs.

With respect to the July 10th flyer, the only information that the bar obtained regarding who may have posted it was a patron's description to Brian Homme, the owner of the bar, that two black men distributed the flyer, one approximately the same height as Homme, the other one "bigger than" Homme. (Glidden Aff. Exh. 15 at 40-41.) As Homme acknowledged, this description "could have fit a lot of people." (Glidden Aff. Exh. 15 at 40.)

With respect to the latter flyer, both Glenn and Anderson have established that they were not in Minneapolis on Tuesday, July 18th between the hours of noon and 2:00 p.m., so they could not have been the men observed by Verzalik. Glenn spent the morning in Albert Lea, Minnesota conducting a product training session at the Albert Lea Medical Center, and from 1:00-2:30 p.m., he met with his sales supervisor, Mark Chelberg, to discuss the morning training session. (Glenn Aff. ¶ 4; Chelberg Aff. ¶¶ 3-4.) Glenn did not leave Albert Lea until after his meeting with Chelberg. (Id.) Meanwhile, time sheets for Anderson indicate that he was at his place of employment in Eden Prairie, Minnesota on July 18th and

phone records establish that he was on the phone numerous times during the period from noon to 2:00 p.m. (Anderson Aff. ¶¶ 4-5; Matz Aff. ¶¶ 2-3; Glidden Aff. Exh. 19.)

Based on these facts and the lack of any other evidence linking plaintiffs to the flyers, the court concludes that the flyers cannot form the basis for defendant's counterclaim.[2] The only possibly actionable statements are those made by Anderson in his e-mails to local television stations. Glenn has no connection to those e-mails, therefore, the counterclaim is dismissed as to plaintiff Glenn and the court must evaluate the propriety of the defamation and wrongful interference claims as to plaintiff Anderson alone.

## II. Defamation Claim

To prevail under Minnesota law on claim of defamation, a plaintiff must prove that defendant (1) published a statement of fact; (2) of and concerning him; (3) which was false; and (4) damaged his reputation and lowered his estimation in community. Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 886 (Minn. 1986); Foley v. WCCO Television, Inc., 449 N.W.2d 497, 500 (Minn. Ct. App. 1989), cert. denied, 497 U.S. 1038 (1990).

---

[2] Defendant argues that "the facts concerning [plaintiffs'] presence or participation in [the posting of flyers] still remain unresolved." However, plaintiffs have successfully rebutted Verzalik's testimony and defendant has provided no other "facts" to suggest that plaintiffs had any role in the flyers. The court will not sustain the counterclaim on unsupported allegations of complicity. Celotex, 477 U.S. at 324.

The "of and concerning" requirement represents the common law rule that a plaintiff in a defamation case must show that the statement refers to it, either explicitly or by implication. See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 288 (1964); Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). A plaintiff does not have to be specifically named in the defamatory statement so long as a reader by fair implication would understand the statement to be directed at the plaintiff. Ruzicka v. Conde Nast Publ'n, Inc., 999 F.2d 1319, 1322 n.6 (8th Cir. 1993); W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 111, at 779-80, 783-84 (5th ed. 1984). In this case, there is no way that the recipient could understand Anderson's e-mails to refer to Daddy Rocks. The e-mails merely comment upon "a bar down town" and only upon further inquiry could the recipient learn the identity of the bar in question.

Daddy Rocks suggests, without legal support, that because WCCO responded to the e-mail and Anderson identified the bar, the e-mail satisfies the "of and concerning" requirement. Under this logic, the WCCO e-mail would be defamatory but the nearly identical KSTP e-mail would not, since KSTP did not respond to Anderson and learn the identity of the bar. This peculiar result, which depends entirely on the recipient's further inquiry rather on than the statement itself, compels the court to conclude that the e-mails are not actionable.

The response by the stations to Anderson's e-mails also impacts the court's analysis of defendant's claim of reputational harm. Prosser has commented that "it is not so obvious that any impairment to reputation ... will inevitably result from the publication of a libel privately to one or more persons who may in fact not believe the statement to be true." Prosser § 133, at 796. As previously noted, KSTP did not respond to the e-mail and the record before the court indicates that WCCO did not decide to proceed with a story on the bar until after it had completed its own investigation and determined for itself whether the bar treated African American and Caucasian patrons differently. As Anderson described at his deposition, WCCO set up the testing scenario in order "[t]o try to see what was going on. To see if my story really was a story." (Glidden Aff. Exh. 17 at 105.)

WCCO's wary response suggests that the station neither believed nor disbelieved Anderson's e-mail but rather determined that it must evaluate the truthfulness of Anderson's claim before publishing the story. The law expects nothing less of a reputable news organization and for that reason, the court is not inclined to ascribe defamatory value to what is essentially a "news tip." To the extent that Daddy Rocks suffered reputational harm, it occurred only after WCCO interviewed the staff at Daddy Rocks and filmed the test subjects as they attempted to enter the bar. The court does not believe that a reasonable jury would conclude on these facts

that it was Anderson's e-mail that damaged Daddy Rocks' reputation in the community.

Therefore, based on defendant's failure to produce sufficient evidence to establish its prima facie case, defendant's defamation claim must be dismissed.

**III. Wrongful Interference with Business**

To prevail on a claim for tortious interference with economic expectancy, Daddy Rocks must establish: (1) the existence of a reasonable expectation of economic advantage or benefit; (2) that plaintiffs had knowledge of that expectation of economic advantage; (3) that plaintiffs wrongfully and without justification interfered with defendant's reasonable expectation of economic advantage or benefit; (4) that absent plaintiffs' wrongful act, it is reasonably probable that defendant would have realized the economic advantage or benefit; and (5) that defendant sustained damages as a result of this activity. United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632-633 (Minn. 1982).

Based on the court's dismissal of the defamation claim, Anderson's e-mails were not wrongful and therefore they fail to support a claim of tortious interference. Guinness Import Co. v. Mark VII Distribs., Inc., 153 F.3d 607, 613 (8th Cir. 1998); see also Prosser § 130, at 1007-08 ("[A]ll of the cases in which recovery has been permitted ... have involved conduct tortious in itself, such as fraud or defamation .... There can be no recovery

merely upon the basis of intentional interference, without such otherwise improper conduct"); Harman v. Heartland Food Co., 614 N.W.2d 236, 241 (Minn. Ct. App. 2000) (holding that for purposes of the related tort of wrongful interference with a contractual relationship, "improper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law.")

Further, defendant's handwritten one-page monthly sales figures (Glidden Aff. Exh. 11) and Homme's sketchy estimates of expected profits (Id. Exh. 15) do not establish that absent Anderson's e-mails, it is reasonably probable that defendant would have realized a greater monthly sales. For these reasons, the court dismisses defendant's claim of wrongful interference with economic expectancy.

**IV. Sanctions**

Plaintiffs request sanctions under Fed. R. Civ. P. 11 for defendant's failure to dismiss its counterclaim once plaintiffs provided evidence that they did not distribute protest flyers. Plaintiffs contend that defendant has maintained its claim against plaintiffs only to harass plaintiffs and cause unnecessary delay. The court shares plaintiffs' concern with respect to defendant's insistence that the flyers are somehow actionable as to Glenn and Anderson. Nevertheless, defendant's claims of defamation and

wrongful interference, as a whole, are not so far beyond the pale as to justify Rule 11 sanctions. Plaintiffs' request for sanctions is denied.

**CONCLUSION**

Based on a review of the file, record, and proceedings herein, and for the reasons discussed, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' motion for summary judgment on defendant's counterclaims [Doc. No. 39] is granted.

2. Defendant's counterclaim for defamation (Count I) and wrongful interference with economic expectancy (Count II) is dismissed with prejudice.

3. Plaintiffs' request for sanctions is denied.

Dated: June 15, 2001

David S. Doty, Judge
United States District Court